IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| HANH LACY<br><br>            Plaintiff,<br><br>     vs.<br><br>RENT A CENTER,<br><br>AND<br><br>FURNITURE FACTORY OUTLET,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Case No. _____

**COMPLAINT**
**JURY TRIAL DEMANDED**

Plaintiff, Hanh Lacy, by and through her undersigned counsel, complains as follows:

**NATURE OF THE CLAIMS**

1.   This is a hostile work environment case of racial harassment, constructive discharge and retaliation case, brought pursuant to 42 U.S.C. Sec. 1981; sexual harassment and retaliation case brought pursuant to Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. §2000e, et seq. ("Title VII"); and intentional infliction of emotional distress (tort of outrage) case brought pursuant to the common law of Kansas.

**PARTIES AND JURISDICTION**

2.   At all relevant times herein, Plaintiff worked as a sales representative for joint employers Defendant Rent-A-Center (RAC) and Furniture Factory Outlet (FFO) (collectively "Defendants").

1

3.      Defendant RAC is a corporation with its principal place of business in Plano, Texas. It operates in all fifty states including Wichita, Kansas. Defendant is incorporated in Delaware. RAC is an employer within the meaning of Title VII.  RAC sells electronics, furniture, and other items to customers under flexible rent-to-own agreements, which allow customers to own furniture after an agreed upon rental period. Under its RAC Acceptance program RAC partners with retail stores to offer financing options to customers with bad credit.

4.      Defendant FFO is a limited liability corporation with its principal place of business in Muldrow, Oklahoma. It is incorporated in Delaware. FFO is an employer within the meaning of Title VII.  FFO is a retail outlet that sells furniture at discount prices.

5.      Plaintiff had a contractual relationship within the meaning of 42 U.S.C. Sec. 1981, with FFO and with RAC.

6.      This Court has jurisdiction pursuant to 28 U.S.C. Sec. 1343.  Venue is proper in this district pursuant to Title VII's venue provision, in that the majority of the conduct complained of herein took place within the District of Kansas and the Defendants can be found here.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.      On October 22, 2013, Plaintiff filed a Charge of Discrimination against RAC and a Charge of Discrimination against FFO with the United States Equal Employment Opportunity Commission ("EEOC"), which charged Defendants with unlawful discrimination in the terms and conditions of her employment because of her race and sex.

8.      On February 18, 2014 Plaintiff received in the mail a copy of a Notice of Right to Sue.

9.      This lawsuit has been timely filed within 90 days of Plaintiff's receipt of the EEOC's Right to Sue notices.

## FACTUAL ALLEGATIONS

10.  Ms. Lacy is Asian-American. She was hired by RAC (Rent a Center) Acceptance in July 19, 2012 as a Sales Manager in an FFO (Furniture Factory Outlet) store. RAC provides furniture store customers whose credit precludes traditional financing, a rental option, where the customer can eventually purchase the furniture.

11. On information and belief, the contract between FFO and RAC requires FFO to refer all FFO customers who wished to buy furniture but were not approved for FFO credit to RAC Acceptance employees.

12. RAC customers are low income and disproportionately minority.

13. RAC Acceptance and FFO were joint employers of Plaintiff.

14. RAC Acceptance compensated Plaintiff for her work as a sales manager.

15. RAC Acceptance monitored Plaintiff's hours of work by requiring her to clock into its employee time records system.

16.  RAC Acceptance had the power hire and fire plaintiff.

17. As a joint employer, FFO also controlled the terms of conditions of Plaintiff's employment.

18. FFO controlled the premises at which the Plaintiff worked.

19. FFO set Plaintiff's hours of work.

20. FFO retained the power to exclude Plaintiff from its premises.

21. FFO controlled referrals to Plaintiff, directly determining Plaintiff's earnings.

22. FFO evaluated Plaintiff's job performance and communicated these to RAC, affecting Plaintiff's likelihood of success at her job.

23. FFO retained the power to ban Plaintiff from joint meetings between RAC and FFO.

3

24. Plaintiff had responsibilities at two FFO stores, the East FFO store and the West FFO store.

25. Plaintiff worked at the East FFO store on a daily basis.

26. Plaintiff visited the West FFO store twice a week.

27. Plaintiff had no other RAC assignments while assigned to work at FFO beginning in July 19, 2012.

28. Mark Smith was the East FFO store manager who supervised Plaintiff on a daily basis from July 19, 2012 to late-May or early-June 2013, when he was allowed to resign.

29. Danny Dodd is the East FFO store manager who supervised Plaintiff on a daily basis from late-May or early-June 2013 to October 10, 2013, when she resigned.

30. Donna Krutsinger was an RAC Acceptance District Manager who supervised the Plaintiff from July 19, 2012 to the beginning of January 2013.

31. Josh Smith is an RAC Acceptance District Manager who supervised the Plaintiff from the beginning of January 2013 to October 10, 2013.

32. Throughout the Plaintiff's employment, FFO's store manager and FFO employees racially and sexually harassed the Plaintiff, the Plaintiff's coworkers and FFO's customers.

33. FFO salespeople treated minority customers, including Asians, as well as African-Americans, with contempt. The East side store, with the exception of Ms. Lacy, and Ms. Cruz (the other RAC employee, who reported to Ms. Lacy), was staffed entirely by African-Americans: Mark Smith was the manager; Thomas Williams and Brian McArthur were sales persons. Javon was an inventory worker.

34. FFO employees harassed minority customers. To Asian customers, members of the same protected class as the plaintiff, FFO employees made harassing remarks such as, "this was

4

made in your country you should know how much it was worth." FFO employees

commented that Asian customers "never bought warranties." When speaking with Plaintiff,

FFO employees referred to Asian customers as "your people."

35. FFO employees racially harassed African American customers. They approached African

American customers with stereotypical African American speech. They greeted young

African American customers with "what's up my N*gger." If FFO employees failed to make

a sale, they would say within the customer's hearing range, "that broke ass N*gger did not

buy a thing." FFO employees were cruel to larger African American women, saying "your fat

ass can't fit in there, too big, get up."

36. African-American customers routinely complained to FFO employees and to the FFO store

manager about the pervasive racism at FFO.  Customers complained to the Plaintiff about the

use of the N-word. When FFO employees approached customers with stereotypical African

American speech, Plaintiff overheard the customers respond by saying, "Talk to me like I am

a normal person." Multiple customers approached the Plaintiff with complaints about the

racist treatment they experienced.

37. FFO employees made crude sexual advances toward female customers. Plaintiff received

complaints from women who were called and propositioned after work hours. At work, FFO

employees crudely hit on women by saying, "when you leave, baby why didn't you say

goodbye to me."

38. Mark Smith, the store manager, defended his staff when customers complained about the

sexual and racial harassment they experienced. He failed to discipline his staff. He

encouraged the illegal behavior by joking about the complaints to staff.

5

39. From the beginning of Ms. Lacy's employment, Thomas Williams, an FFO Sales Associate engaged in relentless sexually and racially offensive harassing behavior towards Ms. Lacy. Mr. Williams came into constant contact with Ms. Lacy, on a daily basis. During their conversations Mr. Williams delighted in exercising the power he had over Ms. Lacy by virtue of his ability to withhold sales leads, and make false negative performance reports about her.

40. He would frequently touch her on different parts of her body. Mr. Williams alternated between tugging Ms. Lacy's hair, touching her face, hips, or hands, attempting to hold her hands, or engaging in some other type of unwelcome contact. Ms. Lacy repeatedly explicitly told Mr. Williams that his touching and comments were unwelcome. Mr. Williams ignored her, and continued his harassment and intimidation.

41. Plaintiff interacted with Williams multiple times a day. In almost every conversation they had Williams made sexually harassing and racially offensive remarks. Some of Williams statements included:

- I have dreams about you riding me; I just want to pull your hair and hit it from behind

- I'd love to put you up against the wall and choke you while I fuck you

- I hear Asians are freaks in bed and have tight pussies; I can just imagine me inside your tight pussy; I bet I could make you scream

- I dream about you sucking me and looking up at me with those big eyes; I bet you don't have a gag reflex; you have such a nice mouth for me.

- Why are you playing hard to get? I bet you are loud in bed; Are you a squirter? Let me make you moan; I want to hear you call out my name.

- You be mad if I touched you?

6

- You have some big ole titties. I can't believe you're Asian and have boobs that big; I bet you have tasty nipples; I just want to motor boat you.

- I bet I eat pussy better than your girl; Asians aren't very hairy, Do you have hair down there? Do you shave? I bet you're bald; I want to taste you; You know my tongue is magical.

- Send me some pics of you I can have for my me time; if I buy you a toy will you play with yourself and think about me?

- Have you ever slept with a black guy? It's true what they say, once you go black never go back.

- You're only gay because you haven't had sex with me yet. We should have a threesome, you, your girl, and me.

- Give me a chance, I won't disappoint; What your girl don't know won't hurt her; She can't please you like I could; You're just confused, you're not gay, you were made for me; If you and Juana ever break up will you give me a chance; you know you want to wake up next to me every day.

- You have big luscious lips and I want to kiss them; I bet they taste good; I dream about your lips all over my body.

- If you wear skirts I just want to bend you over the table; skirts are easy access. You have a curvy body.

- If you were with me you would never have to work; you should cook dinner for me… naked; we should make a video.

- When we have a baby it will be beautiful because mixed babies are the best; you
  would be a good mom to my kids.

42.     Williams' harassing behavior was openly observed by Plaintiff's coworkers and

Plaintiff's supervisor, Mark Smith.

43.     Krystal Cruz, Plaintiff's coworker, witnessed Plaintiff's routine harassment. In a sworn

declaration, Ms. Cruz states:

> I have worked with Hanh Lacy at RAC and FFO from July 2012 to mid-March 2013.
>
> I witnessed and experienced sexual harassment from co-worker Thomas Williams toward
> Hanh Lacy and myself on a regular basis while at work. I've seen Thomas grab Hanh's
> hand, talk about her breasts and other body parts, and about Hanh being gay. He said
> "Hanh hasn't been with the right guy, if she had sex with me she'd change to guys." He
> also made similar inappropriate comments to me.
>
> *See*, Declaration of Krystal Cruz ¶¶ 2-3, attached as Exhibit A.

44.     On October 24, 2012, Plaintiff complained in writing, via email, to Donna Krutsinger, an

RAC Acceptance District Manager, about the ongoing sexual harassment. She understood that

the information she disclosed would be "kept confidential, as far as possible," as indicated by the

employment guide.

45.     Plaintiff stated, in pertinent part:

> For the last few months I have been sexually harassed by and employee of FFO. I have
> told him to stop multiple times that his actions are make me uncomfortable. The first time
> I told him to stop he became very angry and made it very awkward to work with him. He
> eventually got over it and started harassing me again. I told him to stop but he didn't this
> time he told me I am just playing hard to get and I assured him that that wasn't the case.
> While I was gone for my surgery he started making advances at Krystal started being
> more handsy and making comments about her physical appearance that has made her
> very uncomfortable as well. She did not want me to tell any one but of course as her
> manager it is very important that I handle the situation so now I am taking the next step.
> Generally I would go to the employees manager that is causing the issue but in this case
> knowing Marks history and his relationship with the employee going to him would just
> create hostility in the store, but I also dread coming to work on days I know I have to

8

work with this guy.

*See*, Plaintiff's Email to Krutsinger, attached as Exhibit B.

46.     Mark's "history" referred to the fact that Ms. Lacy, as well as other FFO employees, had

seen Mark Smith, store manager, sexually harass former FFO Sales Associate Dara Thavone. Mr.

Mark Smith's harassment escalated to the point of following Ms. Thavone to her home one day.

Ms. Thavone resigned in November of 2012. Thus, the whole staff knew that Mr. Mark Smith

condoned sexual harassment of female associates—not to mention racial and sexual harassment

of FFO customers.

47.     After receiving Plaintiff's complaint, Donna Krutsinger inquired about the identity of the

harasser. Plaintiff informed her that it was Williams.

48.     Krutsinger contacted Tom Hughes, RAC Regional Manager, about Plaintiff's complaint.

Hughes referred Krutsinger to RAC's Human Resources Department. RAC's Human Resources

Department, after being contacted by Krutsinger, spoke with the Plaintiff and her coworker, Ms.

Cruz.

49.     Krutsinger shared Plaintiff's complaint with Jason Burns, the FFO District Manager. She

indicated to the Plaintiff that Burns would handle "the problem."

50.     On October 26, 2012, the FFO store manager, Mark Smith, informed the Plaintiff and

Ms. Cruz that they could not attend the regular weekly staff meeting scheduled for the following

day. It was customary that they attend the meeting. No one else was excluded from the meeting.

51.     On October 27, 2012, after the meeting, Dara Thavone informed Ms. Lacy that FFO

District Manager Jason Burns had started the meeting by saying "… there have been reports of

sexual harassment and I bet you can't guess who it was [that made the reports]." Ms. Lacy and

Ms. Cruz were the only employees absent from the meeting. Ms. Lacy was devastated by the knowledge that FFO was not taking her complaint seriously.

52.    Williams was not disciplined for his treatment of the Plaintiff. In fact, Williams' sexual and racial harassment of Plaintiff escalated.

53.    Williams treated Plaintiff's complaint as a "big joke."  He called Plaintiff a "bitch" whenever she walked by him. He harassed her in the same manner as he had before her complaint, now adding "just kidding" after his offensive racial and sexual remarks. He continued to touch the Plaintiff inappropriately.

54.    At least once a week, Plaintiff observed Mark Smith watching Williams as Williams inappropriately touched the Plaintiff or made lewd remarks. After observing Williams, the store manager would laugh and walk away.

55.    Plaintiff's coworkers, including Ms. Cruz, noticed that Thomas William's harassment continued unabated after Plaintiff's complaint.

56.    Ms. Cruz stated under oath that:

> His sexual harassment did not stop. After the October 2012 complaint, I was in a meeting with Hanh, Thomas, and sales associate Josh, where Thomas grabbed me in a bear hug. It caught me off-guard and made me feel very uncomfortable. I never gave Thomas any reason to think he could do that to me. I left the meeting very quickly after he did that to me. Also after October 2012, Thomas would grab/stroke my hands and Hanh's, which made us both upset and uncomfortable. Thomas would take any work-related comment and turn it into a sexual comment. Hanh reported to me that Thomas' comments would make her so upset that she began to have trouble sleeping and would probably need to see a therapist.

> *See*, Declaration of Krystal Cruz ¶5, attached as Exhibit A.

57.    FFO Store Manager Mark Smith and FFO District Manager Jason Burns retaliated against Plaintiff and her coworker, Ms. Cruz, for Plaintiff's complaint against Williams.

58.     After Plaintiff's complaint, Mark Smith became short and rude with Plaintiff and Ms. Cruz. He threatened that he would get Plaintiff "fired" from FFO.

59.     He falsely told RAC Acceptance's District Managers that customers were complaining about Plaintiff.

60.     He warned that he would have Plaintiff banned from FFO's premises, aware that this would jeopardize Plaintiff's employment with RAC Acceptance.

61.     Mark Smith harassed Plaintiff and Ms. Cruz regularly. When Plaintiff and Ms. Cruz would leave the FFO store, he would call their RAC Acceptance supervisor to notify the supervisor that they were leaving.  He insulted the Plaintiff on multiple occasions, saying that she wasn't a salesperson and didn't know how to sell. He belittled the Plaintiff in front of other employees.

62.     He commented on Plaintiff's sexuality, saying on one occasion to Dara Thavone, an FFO sales associate, that "I'm pretty sure Hanh has a thing for you."

63.     Mark Smith encouraged FFO employees to ostracize Plaintiff. He became furious when FFO employees spoke to the Plaintiff. He treated the Plaintiff poorly in front of FFO employees.

64.     Following Mark Smith's lead, FFO employees began treating Ms. Lacy like she didn't exist. They reduced the referrals they gave her.  Prior to Plaintiff's complaint, the Plaintiff received an average of 10 to 15 referrals per month; after her complaint, the referrals she received decreased to approximately 3 a month.

65.     Ms. Cruz states under oath, in her declaration, that:

> After the October 2012 complaint, the FFO employees stopped bringing customers to us. Hanh and I had to approach FFO customers which was not the initial arrangement before the complaint. This directly affected our ability to grow the RAC business at FFO, as well as our bonus/income capacity.

*See*, Declaration of Krystal Cruz ¶6, attached as Exhibit A.

66.     After Plaintiff's complaint, District Manager Burns also began treating Plaintiff differently. Burns visited the East FFO Store one to three times a week. Prior to Plaintiff's complaint, he routinely approached Ms. Lacy on his visits and asked her about business and about the referrals she was receiving. After Plaintiff's complaint, Burns no longer approached her or spoke with her.

67.     When Plaintiff brought the reduction in referrals to Burns' attention, Burns acted dismissively towards her. He said he would speak with Mark Smith, but nothing changed.

68.     Plaintiff also informed Mark Smith about the reduction in her referrals.  He responded with hostility, saying, "Not everyone wants to try the RAC Acceptance program."

69.     Plaintiff complained weekly to RAC District Manager Krutsinger that FFO was bullying her for speaking up about being harassed, by refusing to send her referrals.  Krutsinger agreed with the Plaintiff that she was "probably right," but advised her to "keep working hard." Plaintiff informed Krutsinger that the situation was not improving. She told her that FFO employees continued to withhold referrals from her and to treat her poorly.  Krutsinger advised Plaintiff to "keep her head up," continue to "hope," and things would get better if she kept working hard, although she acknowledged that the Plaintiff was "probably right" about being bullied by FFO.

70.     In spite of Plaintiff's repeated complaints, Mark Smith and Williams were not disciplined.

71.     In January of 2013, Josh Smith took over Krutsinger's position as Plaintiff's RAC Acceptance supervisor. Krutsinger was transferred to work within another area of the company.

72.     Soon after Josh Smith became her supervisor, Plaintiff updated him on the continuing retaliation at FFO. She explained that FFO employees had all but stopped referring financing clients to her following her harassment complaint. Josh Smith responded that he was aware of the harassment she had been subjected to by Williams and they didn't "need to talk about the harassment" as he had been "briefed on what happened."

73.     Josh Smith stated that he felt that "because of what happened as far as the harassment, it broke the relationship with the store and now it's not working at all."

74.     On a weekly basis, Plaintiff continued to update Josh Smith on her referrals. She informed him that her numbers were not improving and that she was forced to solicit FFO customers directly without knowing whether they needed RAC Acceptance financing.  Though Josh Smith praised Plaintiff for her work and acknowledged that Plaintiff was "alone out there" without the store's help, Josh Smith did not take any measures to have Williams or Mark Smith disciplined.

75.     At the end of April of 2013, FFO Store Manager Mark Smith was demoted for poor performance. Upon hearing of the demotion, Josh Smith remarked that "now" Plaintiff's "numbers should go up." Mark Smith was never punished for his retaliation against Plaintiff.

76.     Throughout, Mr. Williams continued to make inappropriate remarks to Ms. Lacy, followed by telling her he was "just joking." He also continued to attempt to touch her.

77.     On February 27, 2013, Williams was alone with Plaintiff in the FFO Office. Plaintiff was moving and requested that Williams hand over a box sitting next to him.  Williams said, "…only if I can have a hug." When Plaintiff attempted to pick up the box herself, Williams grabbed her and kissed her forehead.

78.     Ms. Cruz stated, under oath that:

> In Feb. 2013, in response to another incident with Hanh, both she and I spoke to RAC
> HR. Again, nothing happened to Thomas.

*See*, Declaration of Krystal Cruz ¶7, attached as Exhibit A.

79.     On March 2, 2013, despite fearing further retaliation, Plaintiff emailed RAC Acceptance

District Manager Josh Smith, about the incident. She stated:

> I know that you know about the harassment thing that happened a few months ago but
> now it has escalated to so much more than it was. I was so reassured things would be
> okay and that things would change but honestly they are so much worse now and its to
> the point I am considering looking for another job.

> Ever since the harassment thing came out the store has treated us so differently like they
> despise us. Krystal and I both feel as if we are being bullied everyday. It feels as if they
> are trying to make us quit our jobs. I didn't know how Krystal was feeling until
> recently…she told me how she dreads coming to work everyday (sic) and how she feels
> so bad that she is leaving me to fin (sic) for myself in such a destructive environment. At
> one point she said that she doesn't know if she is going to last until the 15th it is getting
> so bad. I have tried talking to Mark but honestly every time I do it is as if he takes it
> personally and then has an even bigger vendetta against me, against us. He tries to belittle
> me infront (sic) of others he talks about me behind my back and when I come to him to
> try and resolve the problems or ask him about things I have heard he makes me feel
> stupid and insignificant….

> Long story short he [Thomas] kissed me on the forehead the other day and he didn't even
> see the problem with that. I think because they took the whole harassment thing as a big
> joke…I love my job and I love seeing my store grow but I can't continue working like
> this.

> *See*, Plaintiff's email to Josh Smith dated March 2, 2013, attached as Exhibit C.

80.     In March of 2013, Plaintiff's coworker, Cruz, resigned. She could no longer continue to

work under the harassing conditions at FFO.

81.     Following Plaintiff's March 2, 2013 complaint, Josh Smith contacted her. He said that

RAC Acceptance was considering closing the program at FFO. He stated that he didn't want his

employees working "in an environment like that."

82.     On March 8, 2013 at 8 PM, Williams confronted Plaintiff, obviously having been given notice of Plaintiff's complaint. He screamed at Plaintiff and accused her of trying to ruin his life. He threatened that he would ruin her life like she had ruined his.

83.     Plaintiff left the store immediately and locked herself in her car. She was terrified and felt physically threatened. She knew that Williams had a significant amount of information on her, and was aware of where she lived.

84.     Plaintiff telephoned Josh Smith and told him what had happened. He said that he would call FFO District Manager Burns and figure out "what was going on."

85.     The next day, Plaintiff's father accompanied the Plaintiff to work because he was concerned that Williams might attack her.

86.     On March 9, 2013, the Plaintiff and her father reported the February 2013 assault and Williams' March 8 threats, to the police.

87.     Soon afterwards, Josh Smith informed the Plaintiff that Williams had been transferred to the West FFO store. Plaintiff pointed out that this would not solve the problem because she would still have to interact with Williams. Plaintiff had responsibilities at the West FFO store that required her to visit the store twice a week.

88.     Later that day, Josh Smith told the Plaintiff that FFO was investigating the Plaintiff's complaints. While the investigation was underway, the Plaintiff was prohibited from working at the FFO stores; Williams continued to work at FFO during the investigation, and earn sales commissions.

89.     The Plaintiff and Cruz missed work for what turned out to be three days. Though she was paid her hourly rate, she was not able to earn commissions.  No one inquired into Plaintiff or Cruz's losses or offered them reimbursements.

90.     Shortly after Williams' transfer to the West FFO store, Plaintiff spotted Williams driving in her neighborhood. Plaintiff was compelled to move her residence, because she feared for her safety. She found a house in a better part of town. She made sure that it had a connecting garage so she could reach her car directly from her home, and not be vulnerable to attack by Williams.

91.     On March 11, 2013, Krutsinger, in her new position, contacted Plaintiff.  She said that Mark Smith was inquiring into Plaintiff's absence from work. He had informed Krutsinger that Williams had been transferred from the East FFO Store because "he had done it again."

92.     Ms. Lacy reminded Ms. Krutsinger that Mr. Williams had been continuously sexually harassing her—that the most recent assault was simply greater in magnitude, but nothing new— and said FFO Store Manager Mark Smith was "making her life really hard" and was trying to "get her fired."

93.     Later on that same day, RAC District Manager Josh Smith contacted Ms. Lacy and told her that he had spoken with Scott Richards, the FFO Vice-President, Jason Burns, the FFO District Manager and Mr. Williams. He said that they had decided to permanently move Mr. Williams to the West FFO store. Ms. Lacy stated that "I don't think this will fix the problem because I still have to go to the West store and will be working with Thomas there, and I'm not sure I'm okay with that."

94.     In response, Josh Smith implied that Ms. Lacy was free to resign, and told her that if she needed a couple of days to decide what she "wanted to do" that was "fine." Ms. Lacy made it clear she was not quitting. She could not afford not to work.

95.     When she returned to work March 12, 2013, she met with Josh Smith and Mark Smith the FFO store manager. Mark denied that he and others had been retaliating against Ms. Lacy, and tried to paint Mr. Williams' forcible hugging and kissing as only the second incident of sexual harassment, which FFO and RAC knew was not the case.

96.     After returning to work, Plaintiff avoided trips to the West FFO store to keep from interacting with Williams. She lost commissions at the West FFO store on clients to whom she would have extended credit.

97.     However, Mr. Williams came to the East side store when Ms. Lacy was at work, on his days off. He would wear a hooded T-shirt, and yell Ms. Lacy's name from different parts of the store, to taunt her. No one at FFO, including store Manager Mark Smith, said a word.

98.     In or about April the police brought Mr. Williams into the station in connection with Ms. Lacy's complaint, and warned him to stay away from the East side store. Nonetheless, he continued to call the East side store, and would ask to talk to Ms. Lacy about his customers, and financing. Ms. Lacy asked the manager of the West side store to stop him from calling her.

99.     Mark Smith continued to refuse to give or allow his staff to give Ms. Lacy referrals. Ms. Lacy had to reach out to existing RAC customers and those whom they referred, to bring them into the store. She had to then depend on FFO sales persons to sell furniture, and only then did she have an opportunity to sell them an RAC financial product. FFO's records show these

customers as referrals, although she brought the customer into the store, and FFO would otherwise not have gotten the sale.

100.    Ironically, although FFO and RAC were well aware of how Mark Smith was retaliating against and harassing Ms. Lacy, that was not the reason he left FFO. There were 15 to 40 credit declines a month that Mark Smith and his coworkers could have been referring to Ms. Lacy and RAC. Other FFO stores were doing much more business with RAC. FFO management eventually demoted him, at least in part, because of the disparity, and then allowed him to resign.

101.    Mark Smith was never disciplined for retaliating against the Plaintiff.

102.    Danny Dodd, who was Caucasian, became the new East side store manager, in late May or early June. The existing FFO store employees immediately began poisoning the relationship between Ms. Lacy and Mr. Dodd. Mr. Dodd was warned he could not be himself around Ms. Lacy.

103.    After Mr. Smith was allowed to resign, other African-American salespersons were terminated or left. Brian McCarthur was terminated, and inventory worker Javon, were terminated. Thomas Williams, Ms. Lacy's primary assailant, found new employment in July.

104.    FFO told customers they were "cleaning up the store." Some customers complained that all the African-American employees were replaced by Caucasian employees.

105.    The newly hired Caucasian staff continued to make offensive comments about customers based on their race, sex, and national origin.

106.    Dodd and other salespeople use the N-word, acted out African American stereotypes, made jokes about "Ebonics," and imitated purported African American mannerisms.

18

107.    The FFO Vice President, Scott Richards, came to the store, and made sexual comments. He has talked about customers' breasts. He talked about how Ms. Lacy allegedly used her sexuality to her advantage. Mr. Dodd said that the only way she made sales was by flirting, and got out of tickets by showing her breast.

108.    The new store staff made offensive sexual comments to Ms. Lacy, like "check out this hot girl," or "you would not be interested but check out this guy." They seemed to believe this was acceptable so long as they were not directly propositioning Ms. Lacy.

109.    On August 12, 2013, Ms. Lacy's physician ordered that she take Family and Medical Leave Act leave, due to job-related PTSD, panic disorder, and depression. Ms. Lacy began intermittent leave, which allowed her to take of part-days, when the stress of the racial and sexual harassment became overpowering and disabling.

110.    Although there was a new staff, they were aware that Ms. Lacy had complained about sexual harassment. Since the change in staff took place in stages, they had been warned by prior employees to avoid her, and encouraged not to refer customers. As a consequence, she was still paying a price for her complaints. On September 6, she made yet another complaint via email to her District Manager, Josh Smith:

> Well as usual there is a lot of drama at FFO Home. The store manager Danny Dodd was/is suspended has been almost all week due to conduct. On Monday . . . he called me an f\*\*ing dike.  Now the argument between Danny and I was not what got him suspended I guess there has been a number of things that led to this. Danny will be returning to work tomorrow and I am very very apprehensive on his return. I just wanted to you know kind of what is going on because I do feel like you should know what is going on in your stores. When I got back on Wednesday, I was told by Sam and Tony that Danny was telling customer not to use our program. I do feel like that is a personal attack against me.

*See*, Plaintiff's email to Josh Smith dated September 6, 2013, attached as Exhibit D.

19

111.    Plaintiff continued to suffer from a significant reduction in income, and from severe

psychological injury due to the ongoing harassment and unremitting retaliation at FFO.

112.    On October 10, 2013, she gave notice. In her email she explained that:

> I continue to hear offensive sexual speech from FFO employees, including FFO VP Scott
> Richards, and offensive racial speech from FFO coworkers. Store manager Danny Dodd
> called me a "fucking dyke," which I took to be retaliatory. I have kept my RAC and FFO
> supervisors abreast of these problems, without result. My compensation
> remains significantly less than before I complained of sexual harassment. It was recently
> determined by my medical provider that discrimination and retaliation working at the
> FFO store for FFO and RAC is injurious to my health.

## Count One

### Racially Hostile Work Environment
### In Violation of 42 U.S.C. 1981
### Against Defendants Furniture Factory Outlet and Rent-A-Center

113.    Plaintiff incorporates by reference paragraphs 1 through 112.

114.    Defendants Furniture Factory Outlet and Rent-A-Center engaged in illegal, intentional

discrimination on the basis of race, by creating a hostile work environment.

115.    As a consequence of Defendants' conduct, Plaintiff suffered emotional distress.

116.    Defendant's' actions proximately caused Plaintiff's injuries.

## Count Two
### Sexual Harassment
### In Violation of Title VII of the Civil Rights Act of 1964
### Against Defendants Furniture Factory Outlet and Rent-A-Center

117.    Plaintiff incorporates by reference paragraphs 1 through 116.

118.    Defendants engaged in illegal, intentional discrimination on the basis of sex, by creating

a hostile work environment.

119.    As a consequence of Defendants' conduct, Plaintiff suffered emotional distress.

120.    Defendants' actions proximately caused Plaintiff's injuries.

## Count Three

### Retaliation
### In Violation of Title VII of the Civil Rights Act of 1964
### Against Defendant Furniture Factory Outlet and Rent-A-Cent

121.    Plaintiff incorporates by reference paragraphs 1 through 120.

122.    Defendants engaged in illegal retaliation by banning Plaintiff from attending meetings, withholding customer referrals from Plaintiff, harassing Plaintiff, and engaging in other adverse actions against Plaintiff for complaining about discrimination.

123.    As a consequence of Defendants' conduct, Plaintiff suffered emotional distress.

124.    Defendants' actions proximately caused Plaintiff's injuries.

## Count Four

### Retaliation
### In Violation of 42 U.S.C. 1981 of the Civil Rights Act of 1964
### Against Defendant Furniture Factory Outlet and Rent-A-Cent

125.    Plaintiff incorporates by reference paragraphs 1 through 124.

126.    Defendants engaged in illegal retaliation by banning Plaintiff from attending meetings, withholding customer referrals from Plaintiff, harassing Plaintiff, and engaging in other adverse actions against Plaintiff for complaining about discrimination.

127.    As a consequence of Defendants' conduct, Plaintiff suffered emotional distress.

128.    Defendants' actions proximately caused Plaintiff's injuries.

## Count Five

### Discriminatory Discharge
### In Violation of 42 U.S.C. 1981

**Against  Furniture Factory Outlet and Rent-A-Center**

129.    Plaintiff incorporates by reference paragraphs 1 through 128.

130.    As a result of Defendants' conduct, Plaintiff was subjected to discriminatory working conditions that were so intolerable that Plaintiff was forced to resign from her position.

131.    As a consequence of Defendants' conduct, Plaintiff suffered emotional distress.

132.    Defendants' actions proximately caused Plaintiff's injuries.

**Count Six**

**Discriminatory Discharge**
**In Violation of Title VII of the Civil Rights Act of 1964**
**Against Defendant Furniture Factory Outlet and Rent-A-Center**

133.    Plaintiff incorporates by reference paragraphs 1 through 132.

134.    As a result of Defendants' conduct, Plaintiff was subjected to discriminatory working conditions that were so intolerable that she was forced to resign from her position.

135.    As a consequence of Defendants' conduct, Plaintiff suffered emotional distress.

136.    Defendant's actions proximately caused Plaintiff's injuries.

**Count Seven**

**Intentional Infliction of Emotional Distress (Tort of Outrage)**
**In Violation of Kansas Common Law**
**Against Defendants Furniture Factory Outlet**

137.    Plaintiff incorporates by reference paragraphs 1 through 136.

138.    Defendant willfully and wantonly intended to inflict severe emotional distress on Plaintiff by subjecting her to sexual and racial harassment and retaliation.

139.    As a consequence of Defendant's actions, Plaintiff suffered severe and extreme emotional distress.

140.    The sexually and racially harassing acts and retaliation condoned by Defendant went beyond the bounds of decency such that they were atrocious and utterly intolerable in a civilized society.

141.    Defendant's actions proximately caused Plaintiff's injuries.

**Count Eight**

**Intentional Infliction of Emotional Distress (Tort of Outrage)**
**In Violation of Kansas Common Law**
**Against Defendant Rent-A-Center**

142.    Plaintiff incorporates by reference paragraphs 1 through 141.

143.    Defendant willfully and wantonly intended to inflict severe emotional distress on Plaintiff by being aware of and condoning the sexual and racial harassment, and retaliation to which she was subjected.

144.    As a consequence of Defendant's actions, Plaintiff suffered severe and extreme emotional distress.

145.    The sexually and racially harassing acts condoned by Defendant went beyond the bounds of decency such that they were atrocious and utterly intolerable in a civilized society.

146.    Defendant's actions proximately caused Plaintiff's injuries.

**JURY DEMAND**

147.    Plaintiff herein demands a trial by jury for all issues in this action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests:

a.     Judgment against defendants for violations of 42 U.S.C. 1981, 42 U.S.C. 2000, and the

common law;

b.     Compensatory damages for emotional distress;

c.     Compensatory damages in the form of lost wages;

d.     Punitive damages;

e.     An award of prejudgment interest;

f.     All costs and attorneys' fees incurred prosecuting these claims; and

g.     For such further relief as the Court deems just and equitable.

Dated: May 14, 2014
       Mamaroneck, NY

                              Law Offices of Joshua Friedman

                              ____/s/ Joshua Friedman_____
                              Joshua Friedman
                              Rebecca Houlding
                              Law Offices of Joshua Friedman
                              1050 Seven Oaks Lane
                              Mamaroneck, NY 10543
                              888-369-1119
                              Fax: 866-731-5553
                              josh@joshuafriedmanesq.com
                              rebecca@joshuafriedmanesq.com
                              *To Be Admitted Pro Hac Vice*


                              Local Counsel:

                              By:  ___/s/ Michael Hodgson_____
                              Michael Hodgson KS # 21331
                              **The Hodgson Law Firm, L.L.C.**
                              6 NW Main St.
                              Lee's Summit, MO 64063
                              Telephone:     (913) 890-3529
                              Email: mike@thehodgsonlawfirm.com